**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE APPLICATION PURSUANT TO 28 U.S.C. § 1782 FOR DISCOVERY IN AID OF FOREIGN PROCEEDINGS | Misc. Action No. _____ |

### APPLICANT REPUBLIC OF KAZAKHSTAN'S
### *EX PARTE* APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782
### TO TAKE DISCOVERY IN AID OF FOREIGN PROCEEDINGS

Applicant Republic of Kazakhstan ("**Kazakhstan**"), by and through its undersigned counsel, hereby applies *ex parte* for an Order pursuant to 28 U.S.C. § 1782 granting Kazakhstan leave to serve subpoenas *duces tecum* ("**Subpoenas**") on:  (a) The Bank of New York Mellon Corporation; (b) JPMorgan Chase Bank, N.A.; (c) Deutsche Bank Trust Co. Americas; (d) Bank of China; (e) Barclays Bank PLC; (f) BNP Paribas USA; (g) Citibank N.A.; (h) The Clearing House Payments Company LLC (CHIPS); (i) Commerzbank AG; (j) HSBC Bank USA, N.A.; (k) Société Générale S.A.; (l) Standard Chartered Bank USA; (m) UBS AG; (n) Wells Fargo Bank, N.A.; and (o) Bank of America, N.A. (collectively, "**Clearing Banks**") for discovery to be used in judicial enforcement proceedings that Kazakhstan intends to bring in England ("**Enforcement Proceedings**"), as well as future judicial legal proceedings that may be brought in other foreign jurisdictions ("**Prospective Enforcement Proceedings**").  In support of this Application, Kazakhstan states as follows:

### NATURE OF THE APPLICATION

1. This is a limited-purpose action brought pursuant to 28 U.S.C. § 1782 ("**Section 1782**") to obtain evidence from the Clearing Banks that will be used in foreign judicial proceedings

to enforce and collect upon an arbitral award that was issued in Kazakhstan's favor ("**Arbitral Award**").  Kazakhstan obtained the Arbitral Award in an investor-state arbitration, PCA Case No. 2016-23, conducted under the UNCITRAL arbitration rules ("**Arbitration**") that a Canadian company called Gold Pool JV Limited ("**Gold Pool**") commenced against Kazakhstan in March of 2016.

2.      The Clearing Banks, who played no role in the underlying Arbitration, owe no money under the Arbitral Award, and who are not alleged to have engaged in any wrongdoing in connection with this matter, act as correspondent institutions and collectively process all U.S. dollar-denominated transactions that were originated outside of the United States.

3.      The Arbitral Award ordered Gold Pool to pay Kazakhstan approximately $▮▮▮▮▮▮▮ ▮▮▮▮.  Gold Pool has not paid any amounts under the Arbitral Award, but it is believed to have originated and/or received U.S. Dollar-denominated transactions that were originated outside the United States.  If so, the Clearing Banks will undoubtedly possess information about these transactions.

4.      Therefore, upon information and belief, the Clearing Banks possess information about financial transactions involving or relating to Gold Pool, and permitting discovery into these transactions will:

   a.      Help expedite the resolution of the Enforcement Proceedings;

   b.      Assist in satisfying the Arbitral Award and judgment that is expected to arise from the Enforcement Proceedings; and

   c.      Guide the commencement of Prospective Enforcement Proceedings that will likely be needed to collect the substantial sums that Gold Pool owes Kazakhstan under the Arbitral Award.

5.    Granting this Application will therefore serve the exact purpose for which Congress enacted Section 1782 – namely, providing judicial assistance to parties seeking evidence from the United States for use in foreign proceedings.

6.    As discussed in greater detail in Kazakhstan's accompanying Memorandum of Law, the Application:

    a.    Meets the three statutory requirements set forth in Section 1782 for granting the Application; and

    b.    Satisfies the four discretionary factors the Supreme Court enunciated in *Intel Corporation v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004) ("***Intel* Factors**") for granting the Application.

7.    As Kazakhstan's accompanying Memorandum of Law also explains, Section 1782 applications are routinely granted *ex parte*.

8.    Consequently, the Application satisfies the legal and factual requirements for an *ex parte* Order pursuant to Section 1782 and granting the Application would serve the exact purpose for which Section 1782 was enacted.

9.    Kazakhstan is therefore entitled to serve the Subpoenas on the Clearing Banks, a model draft of which is attached hereto as **Exhibit A**.

10.   A proposed Order granting that relief is also attached hereto as **Exhibit B**.

**PARTIES**

11.   Kazakhstan is a sovereign nation located in central Asia that gained independence in 1991.

12.   Kazakhstan was the respondent in the underlying Arbitration that gave rise to the Arbitral Award, and is seeking to collect approximately $▮▮▮▮▮ that Gold Pool currently owes it under the Arbitral Award.

13.     The Clearing Banks are financial institutions that are found in the Southern District of New York within the meaning of Section 1782, and all act as clearing institutions for U.S. Dollar-denominated transactions that are effected outside the United States.

14.     The Clearing Banks are repositories of financial information about Gold Pool that Kazakhstan needs in order to collect upon the Arbitral Award, and Section 1782 authorizes this Court to Order the Clearing Banks to disclose that information.

## JURISDICTION AND VENUE

15.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1782 and 28 U.S.C. § 1331, because this action arises under the laws of the United States. *United Co. Rusal, PLC v. Trafigura A.G.*, No. 3:11mc17 (SRU), 2011 U.S. Dist. LEXIS 26897, at *17 (D. Conn. March 16, 2011) (stating that "the court has subject matter jurisdiction arising under 1782 and through the operation of section 1331"); *see In re Int'l Judicial Assistance*, No. 14-mc-80083-JST, 2014 U.S. Dist. LEXIS 37028, at *2 (N.D. Cal. March 19, 2014) (noting that the "district court has subject-matter jurisdiction" over applications brought under 28 U.S.C. § 1782).

16.     This Court is the proper venue for this action because the Clearing Banks are found in this District within the meaning of Section 1782. *See* 28 U.S.C. § 1782 (stating that "[t]he district court in which a person is . . . found" may order that person to provide discovery).

17.     Upon information and belief:

    a.     The Bank of New York Mellon Corporation is headquartered at 240 Greenwich Street, New York, New York 10286, and regularly transacts business here.

    b.     JPMorgan Chase Bank, N.A. is headquartered at 383 Madison Avenue, New York, New York 10004, and regularly transacts business here.

    c.     Deutsche Bank Trust Co. Americas maintains a significant presence at 60 Wall Street, New York, New York 10005, and regularly transacts business here.

d.   Bank of China maintains a branch at 1045 Avenue of the Americas, New York, New York 10018, and regularly transacts business in this District.

e.   Barclays Bank Plc maintains a branch at 745 Seventh Avenue, New York, New York 10019, and regularly transacts business in this District.

f.   BNP Paribas USA maintains a branch at 787 Seventh Avenue, New York, New York 10019, and regularly transacts business in this District.

g.   Citibank, N.A. is headquartered at 388 Greenwich Street. New York, New York 10013, maintains several branches within this District, and transacts significant business here.

h.   The Clearing House Payments Company LLC, otherwise known as CHIPS, maintains branches in New York, including an office at 1114 Avenue of the Americas, 17th Floor, New York, New York 10036, and regularly transacts business in this District by clearing and settling funds between institutions that process U.S. Dollar-denominated transactions initiated abroad by international banks, as well as by transmitting instruction messages in connection with those transactions.

i.   Commerzbank AG maintains a branch at 225 Liberty Street, New York, New York 10281, and regularly transacts business in this District.

j.   HSBC Bank USA, N.A. is headquartered at 452 Fifth Avenue, New York, New York 10018, and regularly transacts business in this District.

k.   Société Générale S.A. maintains a branch at 245 Park Avenue, New York, New York 10167, and regularly transacts business in this District.

l.   Standard Chartered Bank USA maintains a branch at 1095 Avenue of the Americas, New York, New York, and regularly transacts business in this District.

m.   UBS AG maintains branches in this District, including at 1285 Avenue of the Americas, New York, New York 10019, and regularly transacts business here.

n.   Wells Fargo Bank, N.A. maintains multiple branches in this District and regularly transacts business here.

o.   Bank of America, N.A. maintains a significant branch at One Bryant Park, 115 West 42nd Street, New York, New York 10036, and regularly transacts business here.

## **BACKGROUND**

18.   This Application has arisen because Gold Pool:

a.   Commenced the Arbitration against Kazakhstan by Notice of Arbitration dated 22 March 2016;

b.      Lost the Arbitration on jurisdictional grounds in 2020;

c.      Was ordered to reimburse Kazakhstan for the substantial costs Kazakhstan was forced to incur defending against Gold Pool's fruitless claims;

d.      Has failed to pay Kazakhstan the ███████ dollars it owes Kazakhstan as compensation for the costs Kazakhstan incurred to defend against those failed claims; and

e.      Has failed voluntarily to comply with the Arbitral Award, which forces Kazakhstan to pursue Gold Pool's assets through legal means so that Kazakhstan can judicially compel Gold Pool to turn over funds or assets sufficient to satisfy the Arbitral Award.

19.    Gold Pool alleged in the Arbitration that it was entitled to damages in excess of $917,000,000 from Kazakhstan for claims that Gold Pool asserted under an investment treaty that the Government of Canada entered into with the Soviet Union in 1989 ("**Investment Treaty**") before Kazakhstan became a sovereign country.

20.    After years of arbitrating Gold Pool's claims, which included the submission of multiple rounds of pre-hearing briefing, documentary evidence, witness and expert testimony, a ██ ██ oral hearing held in July and August of 2019, and ██ rounds of written post-hearing submissions, a three-arbitrator tribunal of prominent public international law experts ("**Arbitral Tribunal**") found that Gold Pool was not entitled to assert claims against Kazakhstan under the Investment Treaty.

21.    Therefore, on July 30, 2020, the Arbitral Tribunal issued the Arbitral Award which, in relevant part:

a.      Dismissed Gold Pool's claims against Kazakhstan on jurisdictional grounds; and

b.      Ordered Gold Pool to reimburse Kazakhstan for the costs Kazakhstan incurred to defend against Gold Pool's jurisdictionally deficient claims.

22.    The Arbitral Award, which is immediately operative, specifically obligates Gold Pool to pay Kazakhstan $███████ for legal fees that Kazakhstan expended to defend against

Gold Pool's jurisdictionally deficient claims, as well as $██████ for Kazakhstan's share of the administrative costs of the Arbitration that Gold Pool commenced.[1]

23.     The Arbitral Award also assessed post-award interest on those amounts against Gold Pool at a rate equal to ████████████████████████████████ on any amounts that remain after the date the Arbitral Award was issued (July 30, 2020).

24.     The Arbitral Award therefore requires Gold Pool to pay Kazakhstan approximately $████████████, to compensate Kazakhstan for the substantial sums that Kazakhstan was forced to expend to defend against the jurisdictionally deficient claims that Gold Pool pursued for years in the Arbitration.

25.     To date, Gold Pool has not paid any of the $██████ it owes to Kazakhstan, and has not given any indication that it intends to do so.

26.     Specifically, Kazakhstan wrote to Gold Pool on August 21, 2020, to demand that Gold Pool pay the $██████ that the Arbitral Award requires no later than the close of business on August 28, 2020.

27.     Over one month has now passed since Kazakhstan issued that demand, and Gold Pool has not only failed to pay any of the amounts owed under the Arbitral Award, but has refused to even acknowledge Kazakhstan's payment demand.

28.     It therefore seems apparent that after starting the Arbitration against Kazakhstan under a Soviet-era treaty to which the Arbitral Tribunal found Kazakhstan is not a party, and after

---

[1]     For the sake of comparison, while Kazakhstan claimed approximately $██████ in legal costs to defend against Gold Pool's claims in the Arbitration, Gold Pool claimed in excess of $██████ to pursue those claims. Kazakhstan therefore spent less in legal costs to win, than Gold Pool did to pursue its failed claims.

claiming over $900 million in damages in that Arbitration, Gold Pool wishes to ignore the consequences of its own actions.

29.    In short, Gold Pool appears intent on following the well-worn path of the recalcitrant award debtor from whom payment will have to be judicially coerced.

30.    To that end, Kazakhstan intends to commence the Enforcement Proceedings in the English High Court of Justice in London to judicially enforce the Arbitral Award pursuant to the English Arbitration Act, 1996.[2]

31.    Kazakhstan does not anticipate judicial enforcement of the Arbitral Award through the Enforcement Proceedings will be difficult. However, Kazakhstan anticipates that it will encounter significant difficulty collecting the monies that Gold Pool owes under the Arbitral Award and the expected judgment.

32.    Kazakhstan anticipates that it will encounter these collection challenges because Gold Pool is a special purpose vehicle that no longer conducts any revenue-generating business, and its financial state appears to be highly questionable.[3]

33.    For instance, documents ███████████ show that as of mid to late 2018 – when the Arbitration was well underway – Gold Pool held only $█████ in liquid assets, which is insufficient to satisfy the Arbitral Award.

34.    As Gold Pool does not conduct any independent revenue-generating activities, unless there has been a capital infusion into Gold Pool, its financial position is unlikely to have

---

[2]    Both the United Kingdom and the United States are parties to the New York Convention, which is enabled in the United States by Chapter 2 of the Federal Arbitration Act.  The New York Convention obligates United States courts to recognize and enforce foreign arbitral awards, such as the Arbitral Award at issue in this matter.

[3]    Moreover, ████████████████████████ "after the event" insurance for the Arbitration, which claimants typically secure to cover adverse cost awards when bringing claims in a forum that follows the English Rule on costs.

improved since that disclosure. Thus, under the facts as Kazakhstan currently understands them, Gold Pool will be unable to satisfy the Arbitral Award.

35.     Kazakhstan does know, however, that money was put into Gold Pool, because Gold Pool disclosed in the Arbitration that it received third-party funding to pursue its claims against Kazakhstan.

36.     Specifically, Gold Pool disclosed in the Arbitration that it received funding and/or financial support from three sources:

    a.      a litigation funder registered in Guernsey named ███████ ("**Funder**");[4]

    b.      the law firm of ███████; and

    c.      a Canadian ████████████.

37.     While Gold Pool did not disclose the details of its financial arrangements between ███ ███████ or ███████,[5] it did disclose that the Funder advanced it $██████, and further disclosed that less than $█████ of that $█████ had already been allocated by Gold Pool to costs associated with pursuing the Arbitration.[6]

38.     That disclosure is troubling for three reasons:

---

[4]     The Funder is a subsidiary of a Guernsey fund called ████████████ which is operated by another Guernsey entity called ████████████.

[5]     Gold Pool did disclose, however, that it agreed to give █████ and ███████ ██% of the proceeds of any award that Gold Pool might have received in the Arbitration, and that it would also give the Funder an additional ██% share ████████████ ████████████████████████ ████████████████████████ ████████.

[6]     Kazakhstan does not know the specific terms pursuant to which █████, █████ ███████, or the Funder provided funding and/or financial support to Gold Pool, because Gold Pool did not provide copies of those funding agreements to Kazakhstan in the Arbitration.

a. First, $███████ is less than ██% of the total amount that Gold Pool now owes to Kazakhstan under the Arbitral Award, before interest, and is insufficient on its own to satisfy the Arbitral Award.

b. Second, Gold Pool appears to have already spent approximately $██████ of that $███████ on the Arbitration, ostensibly leaving only $█████████ of the funding available to Kazakhstan as a source of financial recourse.

c. Third, the remaining $███████ – or ██% of the total amount the Funder provided about which Kazakhstan knows – was seemingly used for ██████████████████████████, despite the fact that Gold Pool has no business purpose other than ████████████████████.

39. Consequently, under the facts as Kazakhstan currently understands them, Gold Pool not only received infinitely less cash from the Funder than is necessary to satisfy the Arbitral Award, but apparently diverted approximately ██% of that cash for undisclosed purposes.

40. That troubling state of affairs is further compounded by the fact that Gold Pool ultimately claimed that it incurred (and was entitled to recover) legal costs in the Arbitration totaling $█████████, of which $██████████ were attorney's fees.[7]

41. Gold Pool's claim for $██████████ in legal expenditures after receiving only $██████████ total financing from the Funder, of which less than $████████ was apparently spent on the Arbitration, suggests that Gold Pool likely has access to other assets or funds that could be sufficient to satisfy the Arbitral Award in part or in full.

42. Consequently, it is apparent that to satisfy the ███████████ Arbitral Award, Kazakhstan will have to investigate every possible asset and funding source that Gold Pool might have, as well as Gold Pool's transactions that may constitute fraudulent conveyances, which is what has necessitated this Application.

---

[7] Gold Pool's claimed $██████████ in costs included over $████████ for meals and lodging and over $███████ for duplication and delivery charges, which are not costs for which payment can generally be deferred.

43.     This Application seeks evidence from the Clearing Banks – namely, documents showing

U.S. Dollar-denominated transfers effected outside of the United States that involve Gold

Pool – that will help identify assets, funding sources and potentially fraudulent transfers,

so that Kazakhstan can pursue those matters to recoup the costs to which the Arbitral

Tribunal determined it is entitled.[8]

44.     The Clearing Banks are likely to possess that evidence, because documents that Gold Pool

disclosed in the Arbitration indicate that Gold Pool has transacted in U.S. dollars in the

past, including receiving funding for the Arbitration from the Funder in U.S. Dollars, and

incurring its Arbitration costs in U.S. Dollars.

45.     The Clearing Banks collectively process all U.S. Dollar-denominated transactions that are

effected outside of the United States, and would therefore possess information about U.S.

Dollar-denominated transactions from which Gold Pool benefited or in which it

participated.

46.     Providing that information will allow Kazakhstan to identify assets that can be attached or

otherwise pursued, which will help Kazakhstan collect upon the Arbitral Award and obtain

the substantial monies to which it is entitled under the Arbitral Award.

**TITLE 28 U.S.C. § 1782**

47.     Section 1782 authorizes district courts to order parties found within their district to provide

documentary and testimonial evidence to aid foreign proceedings.

48.     In relevant part, 28 U.S.C. § 1782(a) provides that "[t]he district court of the district in

which a person resides or is found may order him to give his testimony or statement or to

---

[8]     This Application will also help guide where Prospective Enforcement Proceedings might
have to be commenced to collect upon the Arbitral Award.

produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . ." *Id.*

49.  Section 1782 sets forth three statutory requirements for granting an application seeking discovery in aid of foreign proceedings.

    a.    First, the person from whom discovery is sought must reside or be found in the district of the court to which the application is made.

    b.    Second, the discovery must be for use in a foreign proceeding.

    c.    Third, the application must be made by an "interested person."

    *See* 28 U.S.C. § 1782(a).

50.  As Kazakhstan's accompanying memorandum of law sets forth in greater detail, this Application satisfies Section 1782's three statutory requirements because:

    a.    The Clearing Banks are found within this District, as they maintain substantial business operations here;

    b.    The evidence that the Application and Subpoenas seek will be used to support Kazakhstan's Enforcement Proceedings and Prospective Enforcement Proceedings, all of which are foreign court proceedings; and

    c.    Kazakhstan, as a party to the Enforcement Proceedings and any Prospective Enforcement Proceedings that it might commence, is a person interested in those proceedings as a matter of law.

51.  As Kazakhstan's accompanying memorandum of law further discusses, the Application also satisfies the four discretionary *Intel* Factors that the Supreme Court has enunciated.

52.  Lastly, as Kazakhstan's accompanying memorandum of law describes, courts routinely grant Section 1782 applications *ex parte*, because the recipient of a subpoena issued pursuant to Section 1782 has the right to move to quash it if that party believes the Section 1782 application was improperly granted.

53.  Consequently, the Application meets the legal and factual requirements for ordering discovery pursuant to Section 1782 and should be granted *ex parte*.

**THE SUBPOENAS**

54.     A sample draft of the proposed Subpoena is attached to this Application as **Exhibit A**.

**A.      The Evidence the Subpoenas Seek**

55.     The Subpoenas are narrowly tailored to obtain documentary evidence that will identify the location of Gold Pool assets by obtaining information about U.S. Dollar-denominated transfers which Gold Pool has initiated or received overseas.

56.     Specifically, the Subpoenas seek documents from 2013 to the present sufficient to identify any financial transactions the Clearing Banks may have processed that involved Gold Pool, including transactions between Gold Pool and the entities which have provided Gold Pool with funding and/or financial support.

57.     That evidence will assist Kazakhstan in the Enforcement Proceedings by ensuring that the Enforcement Court's anticipated judgment is respected and honored by having that judgment paid.

58.     Lastly, the evidence that the Application and Subpoenas seek will help identify any additional jurisdictions in which Kazakhstan might have to commence Prospective Enforcement Proceedings to collect upon the Arbitral Award.

59.     The Clearing Banks should therefore be required to provide that information as Section 1782 requires.

**B.      The Subpoenas Seek that Evidence In a Minimally Intrusive Fashion**

60.     The Subpoenas are narrowly tailored to seek evidence from the Clearing Banks in a minimally intrusive fashion that is specifically designed to lessen their compliance burden.

61.     For instance, instead of requesting "any and all" documents, the Subpoenas seek only "documents sufficient to identify."

62.     Moreover, the Subpoenas only seek information about U.S.-Dollar denominated financial

transactions in which Gold Pool participated, as well as information about other Gold Pool

assets those institutions might hold, or have information about, which is directly relevant

and material to the Enforcement Proceedings and Prospective Enforcement Proceedings.

63.     Consequently, under any view of the facts, Kazakhstan has taken every effort to ensure that

the Subpoenas are minimally intrusive and will not unduly impose upon the Clearing

Banks.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Kazakhstan prays for:

a.      An Order pursuant to 28 U.S.C. § 1782 in the form attached hereto as Exhibit B
        granting Kazakhstan leave to serve the Subpoenas upon the Clearing Banks; and

b.      Such other relief as is just and proper.


 Dated: November 5, 2020                          Respectfully submitted,


                                                  **DRAPER & DRAPER, LLC**

                                                  Matthew E. Draper, Esq.
                                                  New York Bar No. 4368502
                                                  *Attorneys for The Republic of Kazakhstan*

                                                  200 Park Avenue
                                                  Suite 1700
                                                  New York, New York 10166
                                                  Phone: 347-442-7788
                                                  E-mail: matthew.draper@draperllc.com